UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MAJOR CALHOUN,                    )
                                  )
          Plaintiff,              )
                                  )
     vs.                          )          Case No. 4:07CV1284 CDP
                                  )
MISSOURI DEPARTMENT OF            )
CORRECTIONS, et al.,              )
                                  )
          Defendants.             )

## MEMORANDUM AND ORDER

Plaintiff Major Calhoun, a prisoner, brings this 42 U.S.C. § 1983 action pro
se, claiming that he was denied adequate medical care, subjected to cruel and
unusual punishment, retaliated against, and denied due process while incarcerated
at Potosi Correctional Center (PCC). Calhoun brings claims against the prison
doctor (Dr. William McKinney), a nurse (Tracy Dunn), three correctional officers
(Jeffrey Harper, Renita Hatcher, and Ryan Weber), a prison caseworker (Brian
Allen), as well as the Superintendent of PCC (Don Roper) and the Assistant
Superintendent (Ian Wallace).

All defendants move for summary judgment. The medical defendants
(McKinney and Dunn) contend that Calhoun cannot maintain an eighth
amendment deliberate indifference claim against them as a matter of law. They

are right.  Calhoun's claim essentially amounts to a disagreement over his course of treatment, which is not actionable, or at most a delay in rendering medical care, which fails here because Calhoun offers no evidence -- much less the required medical verifying evidence -- that he suffered any detrimental effect from the alleged delay.

The PCC defendants move for summary judgment on a variety of grounds. They contend that: Calhoun was not denied medical care; PCC supervisors cannot be held liable under a theory of respondeat superior; Calhoun failed to exhaust his grievances as to defendant Hatcher; the conditions in Calhoun's cell did not rise to the level of an eighth amendment violation; Calhoun was not retaliated against for filing a grievance; and, he was not deprived of due process.  Because the PCC defendants are entitled to judgment as a matter of law on all of Calhoun's claims, their motion for summary judgment will be granted.  My analysis follows.

## Legal Standards Governing Summary Judgment

In considering a motion for summary judgment, the court must view the facts and inferences from the facts in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  As the moving party, defendants must establish that there is no genuine

issue of material fact and that they are entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986);

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party has

met this burden, the nonmoving party may not rest on the allegations in its

pleadings, but by affidavit or other evidence must set forth specific facts showing

that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). "[A] complete

failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

To survive a motion for summary judgment, the "nonmoving party must

'substantiate his allegations with sufficient probative evidence [that] would permit

a finding in [his] favor based on more than mere speculation, conjecture, or

fantasy." Putman v. Unity Health System, 348 F.3d 732, 733-34 (8th Cir. 2003)

(internal quotation marks and citation omitted). A party may not merely point to

unsupported self-serving allegations, but must substantiate allegations with

sufficient probative evidence that would permit a finding in the plaintiff's favor.

Wilson v. Int'l Bus. Machs. Corp., 62 F.3d 237, 241 (8th Cir. 1995). "The mere

existence of a scintilla of evidence in support of the [party's] position will be

insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff." <u>Anderson</u>, 477 U.S. 242 at 252; <u>Davidson & Associates v. Jung</u>, 422 F.3d 630, 638 (8th Cir. 2005). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." <u>Thomas v. Corwin</u>, 483 F.3d 516, 527 (8th Cir. 2007). Although a district court must rule on a motion for summary judgment after viewing the facts in the light most favorable to the non-moving party, it is not required to "accept unreasonable inferences or sheer speculation as fact." <u>Howard v. Columbia Pub. Sch. Dist.</u>, 363 F.3d 797, 800 (8th Cir. 2004); <u>Reed v. City of St. Charles, Missouri</u>, 561 F.3d 788, 791-92 (8th Cir. 2009). Under these standards I review the facts in this case.

### **Background Facts**

*Facts Relating to Medical Defendants*

Calhoun's second amended complaint alleges that: "between the dates of 10-28-05 to 1-1-06 I was denied adequate and proper medical care by defendants . . . while throwing up blood repeatedly and suffering extreme stomach cramps;" Mckinney "was aware of my medical condition for over a year and made no effort to refer me for adequate tests, but instead continued to misdiagnose my condition and give me medication that was of no use;" and, "defendant Dunn was made

aware of my condition and refused to do anything about it. She was shown blood that I had spit up on several occasions and still refused to assist me in receiving medical attention."  Calhoun argues that the alleged failure to properly diagnose and treat him resulted in a hernia and caused him psychological damage.

Calhoun's medical records reveal that he was transferred to PCC in January of 2005.  About one month later, he tested positive for tuberculosis and began receiving treatment and medication.  On February 28, 2005, Calhoun was examined by McKinney for left shin pain, which had resolved.  Between May 2005 and June 2005, McKinney and other PCC medical staff saw Calhoun for various medical concerns, including continued oversight of his tuberculosis and mental health needs.  On July 25, 2005, Calhoun self-declared a medical emergency for an abscess on his right thigh.  McKinney saw Calhoun that same day, treated his abscess, and gave him a lay-in restriction from his kitchen work assignment for three days.  On August 4 and October 27, 2005, Calhoun treated McKinney for his tuberculosis.  On November 14, 2005, Calhoun reported to one of the PCC nurses (not Nurse Dunn) that he coughed up blood one time, and that he had not coughed up blood since.  The nurse offered Calhoun Motrin, but he refused it.  On November 15, 2005, Calhoun self-declared a medical emergency,

reporting that his chest hurt when he breathed. Another PCC nurse, Nurse Blake, documented his complaints, assessed his vital signs, and reported his breathing as even and non-labored. Blake noted, however, that Calhoun appeared teary eyed and afraid. Blake consulted with McKinney, who ordered Ibuprofen/Motrin for his chest pain.

Calhoun's first reported complaint of stomach pain was on November 27, 2005, in a Medical Services Request form (MSR).[1] Calhoun's file contains no MSRs or complaints relating to stomach pain or cramping before November 27, 2005. Nurse Johnston responded to Calhoun's MSR on November 28, 2005. Calhoun told Johnston that his upset stomach was caused by his psychiatric medication, Remeron. Johnston told Calhoun to submit an MSR for psychiatric services so that he could request different medication. Calhoun was also referred to "doctor sick call." McKinney saw Calhoun on November 30, 2005, for his complaints of depression and mental health related concerns. McKinney noted Calhoun's medication and his headaches. On December 14, 2005, Calhoun was

---

[1]PCC contracts with Correctional Medical Services to provide medical care to inmates. PCC inmates in administrative segregation may submit a MSR for non-emergency medical care. When an inmate submits a MSR, he is seen by a nurse or a physician at a scheduled sick call. Calhoun understood that this meant if he submitted a MSR on a Saturday that he would not be seen in sick call until Monday. Alternatively, an inmate make declare themselves as having a medical emergency and receive immediate assistance by a licensed health care staff member.

given Maalox for his upset stomach. Calhoun was evaluated by psychiatric services on December 16, 2005 and December 21, 2005, and was prescribed different psychiatric medications.

On December 31, 2005, Calhoun submitted a second MSR for complaints of headaches, stomach pains, and vomiting. Nurse Couch responded to Calhoun's MSR on January 2, 2006, and assessed his condition. No signs of trauma or distress were noted, and Calhoun was given over-the-counter medications with instructions. During this same period of time, Calhoun also refused his psychiatric medication a couple of times and reported hearing voices. On January 6, 2006, Calhoun submitted a MSR complaining of headaches, stomach pains, and a request for x-rays. Nurse Couch responded to Calhoun's MSR. Calhoun reported that he had stomach problems for two months, a history of bowel obstructions three years before, a hernia in his belly button area, and his last bowel movement was two days ago. Nurse Couch instructed Calhoun to return to sick call if his symptoms worsened. McKinney examined Calhoun on January 12, 2006 for his complaints of nausea and vomiting. Calhoun reported that over the past several months he had complaints of nausea with vomiting 20-60 minutes after lunch, but there was no blood. McKinney examined Calhoun's head, neck, lungs, heart, and

abdomen. Calhoun's lungs were clear, he had active bowel signs, no neurologic symptoms, and increased stress. McKinney also noted that Calhoun's abdomen was soft, his liver and spleen were not enlarged, there was no localized tenderness, and he detected no disease. McKinney prescribed calcium carbonate chewable antacid tablets and 325 mg of Tylenol for his headaches. McKinney also ordered blood work, which was completed on January 23, 2006.

Around February 9, 2006, Calhoun submitted a MSR for stomach pain and headaches. The nurse noted that Calhoun had a current order for Tums and calcium carbonate. A doctor's appointment was scheduled for February 17, 2006. McKinney examined Calhoun on February 17, 2006. Calhoun reported that his last occurrence of nausea and vomiting was three days ago. After the examination, McKinney concluded that Calhoun was worried, but not ill. McKinney noted that Calhoun was well-hydrated and an abdominal exam indicated no mass. McKinney reported that Calhoun's blood work came back negative and diagnosed Calhoun with dyspepsia, or indigestion. He prescribed Zantac, ordered a stool test, and scheduled a follow-up appointment in one month. However, Calhoun did not appear for his follow-up.

The medical records indicate that Nurse Dunn only saw Calhoun on one

occasion — on May 9, 2005, when she issued him over-the-counter medication and Motrin.  Nurse Dunn avers that Calhoun never told her that he was spitting up blood and that she never refused to provide him medical care.

*Facts Relating to PCC Defendants*

Calhoun's second amended complaint also alleges that Calhoun was denied "adequate and proper medical care" by defendants Roper, Hatcher, Weber, and Wallace while he was "throwing up blood repeatedly and suffering extreme stomach cramps."  Calhoun claims that he wrote Roper and Wallace in an "attempt to get them to help me in obtaining medical care," but they refused to do so. Calhoun alleges that Hatcher "turned off" his emergency call button on several occasions when he was attempting to obtain medical assistance and made no effort to see what was wrong with him.  Calhoun also claims that Harper and Weber knowingly moved him to a cell on November 17, 2005 that lacked an adequate working toilet and emergency button.  Calhoun claims that Weber falsely accused him of a conduct violation on November 12, 2005 when he was trying to obtain medical assistance.  Calhoun then alleges that, at the November 15, 2005 disciplinary hearing on the conduct violation, defendant Allen (the hearing officer) refused to call a witness that would have allegedly supported Calhoun's version of

events. Calhoun alleges that Allen and Weber conspired to find Calhoun guilty of the conduct violation in retaliation for Calhoun filing a grievance against Weber.

According to the medical records, the only time Calhoun complained of spitting up blood was on November 12, 2005. Although he verbally informed Weber, Calhoun did not seek emergency medical assistance for his complaints. Instead, Calhoun submitted a MSR. Weber contends that he told one of the nurses that Calhoun claimed to have thrown up blood. Calhoun placed his MSR in the window of the cell, stating that another correctional officer, Menteer, told him to do it. Weber instructed Calhoun to remove the paper from his window during cell count because it obstructed his view. When Calhoun refused, Weber ordered him twice more to remove it. Weber then issued Calhoun a conduct violation for interfering with a count. In response to his MSR, Calhoun was evaluated by a nurse on November 14, 2005. At that time Calhoun reported that he had not coughed up any more blood and refused Motrin for pain relief.

A disciplinary hearing was held on Calhoun's conduct violation on November 15, 2005. Case worker Brian Allen was the disciplinary hearing officer. When Weber issued the conduct violation, Calhoun asked that two witnesses, Weber and inmate Michael Taylor, be called at the hearing. However,

at the hearing Calhoun asked that Menteer be called as a witness. Allen refused, stating that Menteer had not been previously identified as a witness, that his testimony was not relevant to the hearing, and that it was duplicative of other witness statements. After considering the written conduct violation report, the statement of Michael Taylor, and the testimony of Calhoun, Allen found Calhoun guilty of the violation of interfering with a count. Calhoun was placed in administrative segregation for ten days as a result. Calhoun admits that he was guilty of the violation, although he claims that he had a good excuse. Calhoun filed a grievance about this incident against Weber on November 17, 2005.

On November 17, 2005, Calhoun was moved to cell 2C-#19. Although Calhoun alleges that Weber and Harper moved him, he testified that he is unable to recall who moved him to that cell. Weber worked the first shift on that date and Harper worked the third shift; cell moves are generally performed during second shift. Neither defendant remembers moving Calhoun to cell 2C-#19. Calhoun alleges that he was knowingly placed in a cell with a non-working toilet and without an emergency button. The toilet in Calhoun's cell overflowed slightly when he flushed it. Calhoun first used his towel to clean the water from the floor. He was given a plunger, but using it caused some human waste to spill onto the

floor, where it remained for roughly two to three hours. Calhoun was then given a sponge to clean the inside of the cell. The cell's toilet was repaired on November 21, 2005.

On or about January 1, 2006, Calhoun wrote Roper a letter complaining of stomach problems and headaches for the past two months. A letter addressed to "PCC Medical Staff" was attached to Roper's letter. Neither this letter nor its attachment states that Calhoun had been denied medical care. Although Calhoun never wrote Wallace directly to complain of his medical care, Wallace responded to Calhoun's letter on behalf of Roper. Wallace instructed Calhoun to submit a MSR to obtain medical services. Although Roper may make recommendations to medical staff, neither he nor Wallace have any direct control over CMS medical staff, and they do not provide medical treatment to inmates.

Finally, Calhoun claims that defendant Hatcher turned off his emergency button when he was attempting to obtain medical assistance and made no effort to determine what was wrong with him. Hatcher was assigned to PCC's control room "bubble." The bubble is a secure room containing windows that provide a view to all cells in a particular wing of a housing unit. One correctional officer is assigned to the bubble during each shift while other officers, called wing officers,

walk in the wing with direct access to inmates and their cells. Officers assigned to the bubble are responsible for controlling access to the housing unit an individual cells, observing inmates inside the wing, and contacting help if a wing officer is in need of assistance. When an inmate presses the emergency button in his cell, a red light and alarm activate inside the bubble. The bubble officer then instructs the wing officer to investigate the complaint. The bubble officer can then turn off the alarm and switch the red light to yellow; however, the yellow light remains activated. The bubble officer is not permitted to leave the bubble during a shift. It is the responsibility of the wing officer to investigate and respond to all medical requests and emergencies. Calhoun alleges that Hatcher turned off his emergency button and did not leave the bubble to see what was wrong with him. Although Hatcher has no specific recollection of this incident, she testified that her routine practice whenever an inmate pressed the emergency button was to notify a wing officer of the alarm and to switch the alarm off and turn the button to yellow. However, she continues to be aware that the emergency button has been pressed. She is certain that she would have followed this procedure if Calhoun had pressed his emergency button. However, in no event would she have ever been permitted to leave the bubble to investigate Calhoun's alleged medical emergency.

## Discussion

*Calhoun's Claims for Monetary Damages Against the PCC*
*Defendants in Their Official Capacities Are Barred by Sovereign*
*Immunity, and His Request for Injunctive Relief is Moot*

The Eleventh Amendment presents a jurisdictional limit on federal courts in civil rights cases against states and their employees." <u>Murphy v. State of Ark.</u>, 127 F.3d 750, 755 (8th Cir. 1997). Plaintiffs' claims for monetary damages against defendants in their official capacities are barred by the Eleventh Amendment and must be dismissed. "The Eleventh Amendment to the United States Constitution prohibits suits for damages against the state, agencies of the state or state officials acting in their official capacities." <u>Nix v. Norman</u>, 879 F.2d 429, 432-33 (8th Cir. 1989). Although a state official may be sued in his official capacity for prospective injunctive relief, <u>see</u> <u>Heartland Academy Community Church v. Waddle</u>, 427 F.3d 525, 530 (8th Cir. 2005), Calhoun's official-capacity claims fail because his requests for declaratory and injunctive relief are moot. <u>Martin v. Sargent</u>, 780 F.2d 1334, 1337 (8th Cir. 1985) (prisoner's claims for injunctive relief are moot if he is no longer subject to those conditions). However, Calhoun may bring claims for monetary damages against defendants in their individual capacities.

*Calhoun Did Not Exhaust His Administrative Remedies Against Hatcher*

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This statute requires the dismissal of any of Calhoun's claims as to which he has not exhausted his available administrative remedies.  <u>See</u> <u>Jones v. Bock</u>, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (internal citation omitted); <u>Gibson v. Weber</u>, 431 F.3d 339, 341 (8th Cir. 2005).  However, when an inmate has exhausted his administrative remedies as to some, but not all, of his claims, the trial court should proceed with the exhausted claims, rather than dismissing the entire action.  <u>Jones</u>, 549 U.S. at 219-24.

Here, the undisputed facts demonstrate that Calhoun has not even taken the first step to exhaust his administrative remedies against defendant Hatcher.  The PCC prison grievance process requires an inmate to first file an Informal Resolution Request ("IRR") within fifteen days of the alleged incident.  If the IRR is denied the inmate may appeal by filing an Inmate Grievance within five

working days of receipt of the IRR response. Finally, if the inmate is not satisfied with the grievance response he may file an Inmate Grievance Appeal within five working days of the response. The grievance process is considered fully exhausted after the inmate files an Inmate Grievance Appeal. See Cooper v. Minor, 16 S.W.3d 578, 580 (Mo. 2000) (en banc) (explaining that the Missouri Department of Corrections, including PCC, "requires an inmate to file informal resolution requests, grievances, and grievance appeals before the process is exhausted and the inmate can file suit in court."). Calhoun did not file an IRR or complete any of the other steps in the grievance process to complain about Hatcher allegedly turning off his emergency button and failing to check on him, and his time for doing so has long since expired. Because Calhoun did not exhaust his administrative remedies with respect to his claims against defendant Hatcher, Hatcher is entitled to summary judgment on Calhoun's second amended complaint and will be dismissed from this action.

*Respondeat Superior Liability Unavailable Against Defendants*
*Roper and Wallace*

Calhoun's § 1983 claims against defendants Roper and Wallace, the Superintendent and Assistant Superintendent of PCC, must be dismissed because there is no respondeat superior liability under § 1983. Supervisory personnel are

not liable under § 1983 absent "a showing of direct responsibility for the improper action" or "personal involvement of the officer being sued." Harris v. Pirch, 677 F.2d 681, 685 (8th Cir. 1982) (citations omitted). See Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997) ("Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights.") (citation omitted); Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990) ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights."); Glick v. Sargent, 696 F.2d 413, 414-15 (8th Cir. 1983) (finding respondeat superior theory inapplicable in § 1983 actions). A supervisor may be found liable for failure to supervise or control his subordinates only where a plaintiff establishes his "deliberate indifference or tacit authorization of the offensive acts by failing to take remedial steps following notice of a pattern of such acts by his subordinates." Wilson v. City of North Little Rock, 801 F.2d 316, 322 (8th Cir. 1986). "In order for a supervisor to be held liable for the acts of a subordinate, something more must be shown than merely the existence of the supervisor-subordinate relationship." Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987). Absent such allegations, no individual liability can be imposed on defendants Roper and Wallace. Calhoun alleges only that he wrote Roper in

January of 2006 complaining of stomach pain and headaches in the prior months.

At the time Calhoun wrote, he had already received medical treatment for the

complaints raised in the letter.  Wallace responded to Calhoun's letter and told him

to follow established procedures to obtain medical care.  Neither Roper nor

Wallace have any direct control over CMS medical staff at PCC, they do not

provide medical treatment to inmates, and they were not involved in the treatment

decisions made with respect to Calhoun.  Moreover, neither Roper nor Wallace

were personally involved in any of the other alleged constitutional deprivations set

out in Calhoun's complaint — they did not issue him any conduct violations,

transfer him to a different cell, participate in his disciplinary hearing, or turn off

his emergency button.  Because Calhoun cannot demonstrate the direct personal

involvement of defendants Roper and Wallace necessary to establish their § 1983

liability, they are entitled to summary judgment on Calhoun's second amended

complaint and will be dismissed from this action.

> *Defendants Were Not Deliberately Indifferent to Calhoun's Serious
> Medical Needs as a Matter of Law*

Prison officials or their agents violate the Eighth Amendment if they

commit "acts or omissions sufficiently harmful to evidence deliberate indifference

to [an inmate's] serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106

(1976). "Failure to provide medical care to prisoners amounts to a constitutional violation only when the plaintiffs show '(1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Hines v. Anderson, 547 F.3d 915, 920 (8th Cir. 2008) (quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)). "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006) (citing Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)). When an inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, "the objective seriousness of the deprivation should also be measured 'by reference to the effect of delay in treatment.'" Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995), abrogation on other grounds recognized by Reece v. Groose, 60 F.3d 487, 492 (8th Cir. 1995) (quoting Hill v. Dekalb Regional Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994)). Therefore, the inmate "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997) (quoting Hill, 40 F.3d at 1188); see also Jackson v. Hallazgo, 30 Fed. Appx.

668 (8th Cir. Mar. 6, 2002) (unpub. per curiam) (citing <u>Coleman v. Rahija</u>, 114 F.3d at 778, 784 (8th Cir. 1997) ("An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs")); <u>O'Neal v. White</u>, 221 F.3d 1343, *1 (8th Cir. July 12, 2000) (unpub. per curiam) (citing <u>Crowley</u>, 109 F.3d at 502) (concluding that plaintiff's "failure to submit verifying medical evidence to show a detrimental effect from any delay in tests, surgery, or alternative treatments was fatal to his Eighth Amendment claim")).

An objectively "serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." <u>Coleman</u>, 114 F.3d at 784 (internal quotation marks omitted) (quoting <u>Camberos v. Branstad</u>, 73 F.3d 174, 176 (8th Cir. 1995)).

Calhoun argues that Dr. McKinney "misdiagnosed" his stomach pain and failed to adequately treat him. Even if I assume for purposes of this motion only that Calhoun's stomach pain constitutes a serious medical need, this claim fails because a "mere disagreement with the course of the inmate's medical treatment does not constitute an eighth amendment claim of deliberate indifference."

Warren v. Fanning, 950 F.2d 1370, 1373 (8th Cir. 1991) (internal quotation marks and citation omitted).  Here, the undisputed evidence demonstrates that Calhoun submitted four MSRs for complaints of stomach pain from November of 2005 to January of 2006.  Each MSR was addressed by medical staff, including McKinney, who diagnosed Calhoun with indigestion attributable to Calhoun's psychiatric medication.  McKinney treated Calhoun's reported symptoms with prescribed and over-the-counter medication, ordered lab work, physically examined him, and tested Calhoun's stool.  Calhoun's blood work and physical examination results were normal.  Calhoun was also encouraged to report his stomach pain to his mental health providers, so that they could prescribe Zantac for Calhoun to take with his psychiatric medication.  Calhoun offers no evidence, other than his rank speculation, that McKinney's treatment of his stomach pain was "inappropriate."  The only competent evidence in the record indicates that McKinney's actions were aimed at diagnosing and correcting Calhoun's reported stomach pain, as well as treating Calhoun's other medical problems, and there is nothing in the record to support a finding that the medical care was "so inappropriate as to evidence intentional maltreatment."  Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir. 2000) (internal quotation marks and citation omitted).

That Calhoun believes he received better medical care once he was transferred to South Central Correctional Center does not mean that McKinney was deliberately indifferent to his serious medical needs.

Calhoun also alleges that Nurse Dunn and Weber were deliberately indifferent to his medical needs because they failed to provide adequate medical treatment when he told them that he "spit up blood." Calhoun informed Weber on November 12, 2005 that he had vomited blood that morning, but did not self-declare an emergency or seek immediate medical assistance. Instead, he submitted an MSR, which is a routine medical request for services which he knew would be answered in several days. Despite the fact that Calhoun did not declare a medical emergency, Weber claims that he orally informed a nurse that Calhoun had spit up blood. On November 14, 2005, the medical staff responded to Calhoun's MSR. At that time, Calhoun reported to one of the PCC nurses (not Nurse Dunn) that he coughed up blood one time, and that he had not coughed up blood since. The nurse offered Calhoun Motrin, but he refused it. Calhoun alleges that he also reported to Nurse Dunn that he spit up blood, but she ignored it. Calhoun argues that the delay in treating this condition caused him a hernia and mental distress. To succeed on this claim, Calhoun "must place verifying medical evidence in the

record to establish the detrimental effect of delay in medical treatment." Crowley, 109 F.3d at 502. Here, Calhoun offers no medical evidence that any alleged delay or denial of medical treatment for his vomiting resulted in a hernia or any other physical or psychological harm. Without any verifying medical evidence to show a detrimental effect from any delay in treatment, his deliberate indifference claim fails as a matter of law. Defendants McKinney, Dunn, and Weber are entitled to summary judgment on this eighth amendment claim.

*Defendants Weber and Allen Did Not Retaliate Against Calhoun as a Matter of Law*

Calhoun alleges that defendants Weber and Allen conspired to find him guilty of a conduct violation in retaliation for his filing a grievance against Weber. Prison officials may not retaliate against an inmate for engaging in constitutionally-protected activity, such as filing a grievance or instituting litigation. Goff v. Burton, 7 F.3d 734, 736 (8th Cir. 1993); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989). A prison official's action violates § 1983 when performed in retaliation for "the exercise of a constitutionally protected right . . . even if the act, when taken for a different reason, would have been proper." Madewell v. Roberts, 909 F.2d 1203, 1206 (8th Cir. 1990) (citations omitted). Calhoun must first show that he engaged in constitutionally protected conduct and

then show that but for that conduct defendants retaliated against him.  Naucke v. City of Park Hills, 284 F.3d 923, 928 (8th Cir. 2002).

Summary judgment in favor of defendants Weber and Allen is proper because Calhoun did not file his grievance against Weber until two days after the disciplinary hearing on his conduct violation.  Therefore, Calhoun cannot demonstrate the requisite causal connection as a matter of law.  Moreover, Calhoun admits that he was actually guilty, albeit "guilty with excuse," of the conduct violation.  Under these circumstances, Calhoun cannot show that, but for the filing of his grievance against Weber, he would not have been found guilty of the conduct violation.

Moreover, to the extent Calhoun is attempting to challenge his assignment in administrative segregation as retaliatory or in violation of his due process rights, that claim must fail as well.  "Prisoners do not shed all constitutional rights at the prison gate, but lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  Sandin v. Conner, 515 U.S. 472, 485 (1995) (citations omitted).  The focus should be on whether the alleged deprivation imposes an "atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life." Id. at 484. Because administrative

segregation is not an atypical or significant hardship on an inmate, Portley-El v.

Brill, 288 F.3d 1063, 1065 (8th Cir. 2002), and Calhoun was placed there for ten

days after being found guilty of a conduct violation following a disciplinary

hearing, his claim fails as a matter of law. See Robinson v. Kemper, 2007 WL

1385700, *4 (E.D. Mo. May 8, 2007).

*Calhoun's Due Process Rights Were Not Violated*

Calhoun also alleges that his due process rights were violated because he

was not allowed to call correctional officer Menteer as a witness at his disciplinary

hearing, which resulted in his placement in administrative segregation for ten days

after he was found guilty of interfering with a count. This claim fails for the same

reasons discussed above. In Wolff v. McDonnell, 418 U.S. 539 (1974), the

Supreme Court held that the Due Process Clause mandates that inmates be

afforded certain minimum procedural protections, including a qualified right to

call witnesses at a disciplinary hearing, where a state statute regarding good time

credits created a liberty interest in a shortened prison sentence. Id. at 566.

However in Sandin the Court made clear that Wolff's procedural protections are

triggered only where the deprivation underlying the prisoner's claim is sufficiently

severe to trigger the Due Process Clause in the first instance. 515 U.S. at 486.

Because administrative segregation is not an atypical or significant hardship on an

inmate, Portley-El, 288 F.3d at 1065, as a matter of law Calhoun has no right to

the process he claims he was unconstitutionally denied. See Sandin, 515 U.S. at

486 (failure to allow inmate to present witnesses at disciplinary hearing, after

which he received 30 days of segregated confinement, not sufficiently atypical or

significant to create a due process liberty interest); Phillips v. Norris, 320 F.3d

844, 847 (8th Cir. 2003) (no liberty interest infringed where prisoner was confined

to segregation without a hearing). Therefore, defendants are entitled to summary

judgment on Calhoun's due process claim.

*Calhoun's Amended Complaint Does Not State An Equal Protection Claim*

Calhoun's amended complaint alleges that "defendants violated plaintiff's

rights under the Equal Protection Clause . . . ." The Equal Protection Clause, a

protection afforded prison inmates, requires that the government "treat similarly

situated people alike." Murphy v. Missouri Dept. of Corrections, 372 F.3d 979,

984 (8th Cir. 2004) (citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999)).

There is no requirement that the government treat dissimilarly situated people

alike. Klinger v. Dept. of Corrections, 31 F.3d 727, 731 (8th Cir. 1994). To

succeed on an equal protection claim, Calhoun must show that he has (1) been treated differently; than (2) a similarly situated class of inmates; (3) that the different treatment burdens one of his fundamental rights; and (4) that the different treatment is not rationally related to any legitimate penological interest. Murphy, 372 F.3d at 984 (citing Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998)). Calhoun's complaint does not specify how his fourteenth amendment rights were violated, and he does not even allege -- much less provide any evidence -- that he was treated differently than any other prisoner, nor has he even identified any fundamental rights allegedly infringed. Because Calhoun offers no evidence that he was actually treated differently than similarly situated inmates, his equal protection claim fails as a matter of law. Summary judgment is granted to defendants on this claim.

### Calhoun's Conditions of Confinement Claim Against Weber and Harper Fails as a Matter of Law

Calhoun claims that his placement in cell 2C-#19 for four[2] days without a working toilet and without a working emergency button by defendants Harper and Weber violated his eighth amendment right to be free from cruel and unusual

---

[2]Although defendants and Calhoun state in their briefs that Calhoun had no working toilet for two days, the evidence demonstrates that the toilet was actually repaired four days after Calhoun was transferred to the cell, but only two days after the work order was placed.

punishment. "The treatment a prisoner receives and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Brown v. Nix, 33 F.3d 951, 954 (8th Cir. 1994). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." Id. at 955. Accordingly, "a prison official violates the Eighth Amendment when two conditions are met: 1) the deprivation alleged is sufficiently serious - the prison official's act or omission results in the denial of the minimal civilized measure of life's necessities; and 2) the prison official acts with deliberate indifference - he knows of and disregards an excessive risk to inmate health and safety." Id. (internal citations and quotation marks omitted). "Any analysis of confinement conditions must be based on the totality of the circumstances." Smith v. Copeland, 87 F.3d 265, 268 (8th Cir. 1996). "The length of time a prisoner is subjected to harsh conditions is a critical factor in our analysis." Id. at 269. Although exposure to raw sewage may in some cases amount to cruel and unusual punishment, "not every overflowed toilet in a prison amounts to a constitutional violation." Id. at 268.

Applying this standard, the Eighth Circuit has held that conditions far worse than those alleged by Calhoun fail to rise to the level of a constitutional violation.

See, e.g., Smith, 87 F.3d at 269 (no constitutional violation when a pretrial detainee was subjected to raw sewage from overflowing toilet for four days); Goldman v. Forbus, 2001 WL 838997 at *1 (8th Cir. July 26, 2001) (unpub. per curiam) (six nights sleeping on the floor and being sprinkled with urine was not a constitutional violation); O'Leary v. Iowa State Men's Reformatory, 79 F.3d 82, 83-84 (8th Cir. 1996) (four days without underwear, blankets, mattress, exercise and visits not a constitutional violation); Williams v. Delo, 49 F.3d 442, 444 (8th Cir. 1995) (four days without clothes, mattress, running water, bedding, mail, hot food, and hygienic supplies not a constitutional violation); White v. Nix, 7 F.3d 120, 121 (8th Cir. 1993) (eleven days in an unsanitary cell did not amount to a constitutional violation). Calhoun was placed in a cell with an overflowing toilet and without a properly working emergency button for four days. Calhoun was given a plunger and a sponge to clean his cell, and the toilet was repaired two days after the work order was placed. Moreover, Calhoun has failed to establish any injury resulting from the condition of his cell or the fact that it lacked a working emergency button. Accordingly, Weber and Harper are entitled to summary judgment on Calhoun's eighth amendment conditions-of-confinement claim.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motions for summary judgment [#76, #79] are granted, and plaintiff's second amended complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 9th day of November, 2009.